JESSE S. FINLAYSON, SBN 179443
*jfinlayson@ftrlfirm.com*
MATTHEW E. LILLY, SBN 218143
*mlilly@ftrlfirm.com*
**FINLAYSON TOFFER**
**ROOSEVELT & LILLY LLP**
15615 Alton Parkway, Suite 250
Irvine, CA 92618
Telephone:  949.759.3810
Facsimile:  949.759.3812

Attorneys for Christopher R. Barclay,
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 15-02281-LT7 |
| SULLIVAN INTERNATIONAL GROUP, INC., | Chapter 7 |
| Debtor. | Adv. Proc. No. |
| | **COMPLAINT FOR:** |
| CHRISTOPHER R. BARCLAY, chapter 7 trustee, | **(1) BREACH OF FIDUCIARY DUTY;** |
| Plaintiff, | **(2) ABUSE OF CONTROL;** **(3) CORPORATE WASTE;** |
| v. | **(4) UNJUST ENRICHMENT; AND** **(5) DIRECTOR LIABILITY FOR AUTHORIZING ILLEGAL DISTRIBUTIONS UNDER CAL. CORP. CODE § 316** |
| STEVE SULLIVAN, an individual; BRUCE QUATTRONE, an individual; MARK SMITH, an individual; KURT BROWN, an individual; ROSS EPSTEIN, an individual; STEVE WINCHESTER, an individual; JIM JANIS, an individual; JEFFREY GIGLIO, an individual; JOHN COWDERY, an individual; EDWARD STERNAGLE, an individual; and DOES 1 through 50, inclusive, | **JURY DEMAND** |
| Defendants. | |

Plaintiff Christopher R. Barclay (the "Trustee"), the chapter 7 trustee for the bankruptcy estate of Sullivan International Group, Inc. (the "Debtor"), files this Complaint against Defendants Steve Sullivan, Bruce Quattrone, Mark Smith, Kurt Brown, Ross Epstein, Steve Winchester, Jim Janis, Jeffrey Giglio, John Cowdery, Edward Sternagle, and Does 1 through 50 (collectively, the "Defendants") and alleges as follows:

## INTRODUCTION

1.      "There is not enough cash to pay the bills." — Defendant Bruce Quattrone ("Quattrone") in his February 10, 2010 report to the Debtor's board of directors.

2.      Rather than heeding this clear warning about the Debtor's dire financial condition, the Defendants in this action engaged in a clear and unmistakable practice of using the Debtor's assets to enrich themselves through illegal dividends, fraudulent transfers, gross mismanagement of the Debtor, and use of the Debtor's assets to benefit themselves at the expense of the Debtor and its creditors.  The Defendants abused their positions of power and control of the Debtor to protect their own personal interests and the interests of their cronies, and lined their pockets at the expense of the Debtor and its legitimate creditors.  As alleged in more detail below, the Defendants breached their fiduciary duties, abused their authority, wasted the Debtor's assets, unjustly enriched themselves, and violated California law.  Based on these actions, the Debtor suffered damages in an amount subject to proof at trial but not less than $10,000,000.00.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  This adversary proceeding arises under title 11 of the United States Code (the "Bankruptcy Code") and arises in a case under the Bankruptcy Code pending before this Court.

4.      Venue of this adversary proceeding is properly before this Court pursuant to 28 U.S.C. § 1409(a).

1

5.     This Complaint initiates an adversary proceeding within the meaning of Federal Rule of Bankruptcy Procedure 7001.

6.     Pursuant to Local Bankruptcy Rule 7008-1, the Trustee consents to entry of final orders or judgment by the bankruptcy judge if any matters are determined to be core.  Pursuant to Local Bankruptcy Rule 7008-2, the Trustee hereby demands a jury trial in this adversary proceeding.

## PROCEDURAL BACKGROUND AND PARTIES

7.     On April 6, 2015 (the "Petition Date"), the Debtor commenced a case under chapter 11 of the Bankruptcy Code with this Court.  On September 11, 2015 (the "Conversion Date"), the Bankruptcy Court entered an order converting the Debtor's case from chapter 11 to chapter 7.

8.     The Trustee is the duly authorized representative of the Debtor's bankruptcy estate pursuant to section 704 of the Bankruptcy Code.

9.     The Trustee is informed and believes, and on that basis alleges, that the Debtor is a corporation organized and existing under the laws of the State of California, with its principal place of business located in San Diego, California.

10.     The Trustee is informed and believes, and on that basis alleges, that Defendant Steve Sullivan ("Sullivan") is an individual residing in San Diego County, California.  The Trustee is further informed and believes, and on that basis alleges, that at all relevant times, Sullivan has held the positions of Chief Executive Officer for the Debtor and has been the Chairman of the Debtor's board of directors.  The Trustee is further informed and believes, and on that basis alleges, that at all relevant times, Sullivan was a shareholder of the Debtor.  More specifically, the Trustee is informed and believes, and on that basis alleges, that Sullivan owned a 66.37% interest in the Debtor as of the Petition Date.

11.     The Trustee is informed and believes, and on that basis alleges, that Quattrone is an individual residing in San Diego County, California.  The Trustee is further informed and believes, and on that basis alleges, that Quattrone served as the

2

Chief Financial Officer and/or Treasurer of the Debtor at all times relevant to the allegations in the Complaint. The Trustee is further informed and believes, and on that basis alleges, that Quattrone has held the position of Executive Vice President for the Debtor since approximately 2014. The Trustee is further informed and believes, and on that basis alleges, that at all relevant times prior to holding the position of Executive Vice President, Quattrone held the position of President of the Debtor. The Trustee is further informed and believes, and on that basis alleges, that Quattrone has been a member of the Debtor's board of directors since approximately January 2015. The Trustee is further informed and believes, and on that basis alleges, that at all relevant times, Quattrone was a shareholder of the Debtor. More specifically, the Trustee is informed and believes, and on that basis alleges, that Quattrone owned a 33.05% interest in the Debtor as of the Petition Date.

12.    The Trustee is informed and believes, and on that basis alleges, that Defendant Mark Smith ("Smith") is an individual residing in Washington, D.C. The Trustee is further informed and believes, and on that basis alleges, that at all relevant times, Smith has held the position of Chief Operating Officer for the Debtor.

13.    The Trustee is informed and believes, and on that basis alleges, that Defendant Kurt Brown ("Brown") is an individual residing in Carson City, Nevada. The Trustee is further informed and believes, and on that basis alleges, that at all relevant times, Brown has been a member of the Debtor's board of directors.

14.    The Trustee is informed and believes, and on that basis alleges, that Defendant Ross Epstein ("Epstein") is an individual residing in San Diego County, California. The Trustee is further informed and believes, and on that basis alleges, that at all relevant times, Epstein has been a member of the Debtor's board of directors.

15.    The Trustee is informed and believes, and on that basis alleges, that Defendant Steve Winchester ("Winchester") is an individual residing in Los Angeles County, California. The Trustee is further informed and believes, and on that basis

alleges, that at all relevant times, Winchester has been a member of the Debtor's board of directors.

16. The Trustee is informed and believes, and on that basis alleges, that Defendant Jim Janis ("Janis") is an individual residing in Sante Fe County, New Mexico. The Trustee is further informed and believes, and on that basis alleges, that at all relevant times before January 1, 2015, Janis was a member of the Debtor's board of directors. The Trustee is further informed and believes, and on that basis alleges, that Janice ceased to be a member of the Debtor's board of directors on or about December 31, 2014.

17. The Trustee is informed and believes, and on that basis alleges, that Defendant Jeffrey Giglio ("Giglio") is an individual residing in San Diego County, California. The Trustee is further informed and believes, and on that basis alleges, that Giglio held the position of Senior Vice President for the Debtor between approximately March 2009 and February 2012. The Trustee is further informed and believes, and on that basis alleges, that at all relevant times, Giglio was a shareholder of the Debtor. More specifically, the Trustee is informed and believes, and on that basis alleges, that Giglio owned an approximately .58% interest in the Debtor as of the Petition Date.

18. The Trustee is informed and believes, and on that basis alleges, that Defendant John Cowdery ("Cowdery") is an individual residing in Contra Costa County, California. The Trustee is further informed and believes, and on that basis alleges, that at all relevant times before approximately April 25, 2013, Cowdery was a member of the Debtor's board of directors. The Trustee is further informed and believes, and on that basis alleges, that Cowdery ceased to be a member of the Debtor's board of directors on or about April 25, 2013.

19. The Trustee is informed and believes, and on that basis alleges, that Defendant Edward Sternagle ("Sternagle") is an individual residing in San Diego County, California. The Trustee is further informed and believes, and on that basis

4

1  alleges, that at all relevant times through 2015, Sternagle held the position of

2  Corporate Secretary for the Debtor.

3       20.    Sullivan, Quattrone, Brown, Epstein, Winchester, Janis, and Cowdery are

4  collectively referred to herein as the "Director Defendants."

5       21.    The Trustee is unaware of the true names and capacities of the Defendants

6  sued herein as Does 1 through 50, inclusive, and therefore sues said Doe Defendants

7  by such fictitious names.  The Trustee is informed and believes, and on that basis

8  alleges, that each of the Doe Defendants are legally responsible in some manner for the

9  events and happenings alleged herein, and that the damages alleged herein were

10  proximately caused by their conduct.  The Trustee will seek leave of court to amend

11  this Complaint to allege the Doe Defendants' true names and capacities when

12  ascertained.

13  ### LEGAL DUTIES OWED BY THE DEFENDANTS

14       22.    As alleged above, each of the Defendants served as either a director,

15  officer, or both of the Debtor in the four (4) year period prior to the Petition Date.  The

16  Trustee is further informed and believes, and on that basis alleges, that some or all of

17  the Defendants may have also been directors and/or officers of the Debtor's

18  subsidiaries and/or other joint venture entities, including, without limitation, Sullivan

19  Weston Services JVA, LLC, Sullivan Weston Services JVB, LLC, Sullivan ACI

20  Federal Services, Engineering and Environmental Solutions JV, Sullivan Construction

21  Jet Ventures, Inc. f/k/a Sullivan and Charter JV, Inc. and/or Sullivan and Charter JV,

22  Alliance Compliance Group JV, and SEQ Vets JV.  The Trustee is informed and

23  believes, and on that basis alleges, that some of the Defendants' actions alleged in this

24  Complaint may have been taken either nominally or in fact on behalf of one or more of

25  these subsidiaries and/or other joint venture entities.  The Trustee's intention in

26  drafting this Complaint is to include all claims against all Defendants regardless of

27  whether the alleged actions were taken in the Defendants' capacities as directors and

28

5

officers of the Debtor and/or one of the Debtor's subsidiaries and/or other joint venture entities.

23.    As officers and/or directors of the Debtor, the Defendants owed a fiduciary duty of care to the Debtor and its shareholders and creditors.  Such fiduciary duty included the obligation to serve in good faith, in a manner that the Defendants believed to be in the best interests of the Debtor and its shareholders and creditors.  Such duty also required the Defendants to refrain from, among other things, engaging in intentional misconduct or a knowing and culpable violation of law, acts or omissions that they believed to be contrary to the best interests of the Debtor or its shareholders and creditors or that involved the absence of good faith, engaging in any transaction from which they derived an improper personal benefit, and acts or omissions showing a reckless disregard for the Defendants' duty to the Debtor or its shareholders and creditors in circumstances in which they were aware, or should have been aware of a risk of serious injury to the Debtor or its shareholders and creditors.

24.    The Defendants also owed duties to creditors of the Debtor in the case of insolvency, including the duty to avoid actions that would divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors' claims, and to refrain from undertaking acts involving self-dealing or the preferential treatment of creditors.

## GENERAL ALLEGATIONS

25.    As alleged in more detail below, the Trustee is informed and believes, and on that basis alleges, that Defendants, through a series of actions designed to place their individual interests ahead of the interests of the Debtor and its creditors, ultimately caused the Debtor's business to fail resulting in this bankruptcy proceeding.

26.    The Debtor was formed in November 1998.  Prior to the Conversion Date, the Debtor was in the business of providing environmental consulting and engineering services and construction management to public and private sector clients, including the Environmental Protection Agency and Department of Defense.  It was

headquartered in San Diego, California, with regional and project office locations throughout the United States.  The Debtor is a Service Disabled Veteran Owned Business, which qualifies it to receive so-called "set aside" contracts under federal law. As of the Petition Date, the Debtor employed 180 employees and claimed the capability to scale up to 500 personnel.

27.     The Debtor is a Subchapter S corporation under the Internal Revenue Code.  As a result, any profits or losses generated by the Debtor are passed through the Debtor to the Debtor's shareholders and are taxed at the shareholder level.

28.     The Trustee is informed and believes, and on that basis alleges, that the Debtor's financial troubles date back to at least 2005.  In 2005, the Debtor discontinued its clean construction division because of a $4,000,000 loss on a problem project, which resulted in a substantial decrease in working capital and the need to settle with one of its creditors and contract parties (a company called Tetra Tech), which matures in 2018.  As of the Petition Date, the Debtor still owed Tetra Tech $1,660,069.44.

29.     The Trustee is informed and believes, and on that basis alleges, that, in late 2009 or early 2010, the Debtor initially hired Quattrone as an outside consultant. Quattrone conducted an extensive investigation into the Debtor's financial condition and business plan, conducting more than twenty-five (25) interviews and reviewing, among other documents, the Debtor's financial statements, 2010 Draft Business Plans/Budgets, 2008 Draft Audits, October 2009 Comparative Financial Statement, and an email from the Debtor's Chief Executive Officer (Sullivan) "highlighting concerns and issues as he saw them."

30.     On February 10, 2010, Quattrone submitted a comprehensive twenty (20) page report to the Debtor's board of directors describing in detail the Debtor's serious financial problems and "severe cash position."  Quattrone's report included the following findings: (a) "Working Capital is in an under-water position … [d]epending on how you rank the current debt, the range is anywhere between $1.0mm - $3.2mm," (b) the Debtor "is delinquent in paying its bills," (c) the Debtor's cash position was

"dire," and (d) the Debtor was essentially "borrowing today from tomorrow's invoices to pay for yesterday's payables."  Quattrone summed up the Debtor's tenuous financial situation in very blunt terms:  "There is not enough cash to pay the bills."

31.    As of the beginning of June 2010, Neal Clements ("Clements") owned 2,838,925 shares of the Debtor's common stock and was a member of the Debtor's board of directors.  On or about June 7, 2010—less than six (6) months after receiving the Quattrone report detailing the Debtor's serious financial problems—the Debtor's board of directors authorized the Debtor to repurchase 1,200,000 of Clements' shares for $0.42 per share.  In total, the Debtor's board of directors agreed to pay Clements $504,000 plus interest at 10% per annum.  The Debtor's board of directors caused the Debtor to enter into a Redemption Agreement, Secured Promissory Note and Security Agreement with Clements.  Under those documents, the Debtor granted Clements a security interest on all or substantially all of the Debtor's assets securing payment of the purchase price thereby elevating his rights above the Debtor's other creditors.  The Trustee is informed and believes, and on that basis alleges, that Clements directly participated in the board's decision to approve the repurchase of his shares and that he exerted undue influence on his fellow board members.

32.    The Trustee is informed and believes, and on that basis alleges, that on or about December 31, 2010, Sullivan borrowed the sum of $60,000 from the Debtor.

33.    Between April 1, 2011 and March 31, 2012, despite the Debtor's serious financial problems and lack of retained earnings, the Debtor's board of directors authorized, ratified, or otherwise allowed distributions by the Debtor to the company's shareholders totaling approximately $946,679.01.  All of these distributions were paid solely to or for the benefit of the Debtor's directors and officers—Sullivan, Quattrone, and Giglio.

34.    The Trustee is informed and believes, and on that basis alleges, that in 2012 the Debtor paid Sullivan a salary of $1,044,955.00 and paid Quattrone a salary of

8

$1,263,059.00.  These salary amounts were in addition to the substantial illegal distributions paid by the Debtor to Sullivan and Quattrone.

35.     On or about July 28, 2011, the Debtor's board of directors authorized the Debtor to repurchase Clements' remaining 1,638,925 shares of the Debtor for $0.75 per share or $1,229,193.75 total.  Again, the Debtor's board of directors caused the Debtor to enter into a Redemption Agreement, Secured Promissory Note and Security Agreement with Clements.  These documents obligated the Debtor to pay Clements monthly installments of $18,551.83 for seven (7) years beginning on August 1, 2011.  Under these documents, the Debtor granted Clements a further security interest on all or substantially all of the Debtor's assets securing payment of the purchase price thereby elevating his rights above the Debtor's creditors.

36.     In total, the Debtor paid Clements $1,172,266.10 under his stock repurchase agreements.  Despite these massive payments, as of the Petition Date, the Debtor still owed Clements $857,756.42.  The Trustee is informed and believes, and on that basis alleges, that there was no legitimate business justification for the board's approval of the Clements stock repurchase agreements, that the terms of those agreements were grossly one-sided in favor of Clements, and that the significant financial burden placed on the Debtor by these agreements only exacerbated the Debtor's already tenuous financial position.  The Trustee is further informed and believes, and on that basis alleges, that the Debtor's board of directors approved the Clements stock repurchase agreements primary because Clements was either a current or former member of the board and/or officer.

37.     The Trustee is informed and believes, and on that basis alleges, that the Debtor's board of directors authorized and caused the Debtor to enter into similar unfair and one-sided stock repurchase agreements with other former shareholders, including, without limitation, William Ulmer, John Kirschbaum, and David Sullivan.

38.     On or about June 29, 2012, the Debtor and Bridge Bank N.A. ("Bridge Bank") entered into a Business Financing Agreement, whereby Bridge Bank agreed to

provide financing to Debtor.  The Debtor's obligations under the Bridge Bank Business Finance Agreement were personally guaranteed by Sullivan and Quattrone.  The Trustee is informed and believes, and on that basis alleges, that the Debtor almost immediately defaulted on its obligations under the Bridge Bank Business Financing Agreement.

39.    Less than six (6) months after entering into the Business Financing Agreement with Bridge Bank, the Debtor entered into a Forbearance Agreement and First Business Financing Modification Agreement dated as of December 28, 2012.

40.    Over the next two years, the Finance Agreement was amended and modified by a series of seven (7) additional forbearance agreements, (a) a Second Business Financing Modification Agreement dated as of June 7, 2013, (b) a Business Financing Modification Agreement dated as of September 24, 2013, (c) a Forbearance Agreement and Fourth Business Financing Modification Agreement dated as of April 17, 2014, (d) a Forbearance Agreement and Fifth Business Financing Modification Agreement dated as of July 15, 2014, (e) a Forbearance Agreement and Sixth Business Financing Modification Agreement dated as of August 27, 2014, (f) a Forbearance Agreement and Seventh Business Financing Modification Agreement dated as of November 12, 2014, and (g) a Forbearance Agreement and Eighth Business Financing Modification Agreement dated as of December 29, 2014.

41.    On or about September 21, 2012, the United States Air Force awarded a Contract No. FA8903-09-D-8589, Task Order No. 0003, to one of the Debtor's subsidiaries, Sullivan Construction Jet Ventures, Inc. f/k/a Sullivan and Charter JV, Inc. and/or Sullivan and Charter JV ("SCJV").  Pursuant to this award, the Air Force agreed to pay SCJV a "Firm Fixed Price of $34,945,391.76" for completing what is referred to as the Southeast Performance Based Remediation ("SE PBR") project.

42.    The Trustee is informed and believes, and on that basis alleges, that between April 1, 2012 and March 31, 2013, the Debtor's board of directors authorized, ratified, or otherwise allowed distributions by the Debtor to the company's

10

shareholders totaling an additional approximately $806,898.97. Again, these distributions were paid solely to or for the benefit of the Debtor's directors and officers—Sullivan, Quattrone, and Giglio.

43.     The Trustee is informed and believes, and on that basis alleges, that in 2013 the Debtor paid Sullivan a salary of $619,238.00 and paid Quattrone a salary of $468,419.00. These salary amounts were in addition to the substantial illegal distributions paid by the Debtor to Sullivan and Quattrone.

44.     According to the Debtor's Statement of Financial Affairs filed under penalty of perjury in the Debtor's bankruptcy case, the Debtor suffered losses of $867,240.00 in 2013.

45.     The Trustee is informed and believes, and on that basis alleges, that the Debtor's already poor financial condition was further damaged by the federal budget "sequestration" that took effect beginning on March 1, 2013.

46.     The Trustee is informed and believes, and on that basis alleges, that, in April 2013, the Debtor suffered a cash crisis and, as a result, defaulted on payments due to critical vendors, including Park Construction Company (approximately $1,900,000.00) and Meyer Contracting (approximately $500,000.00).

47.     The Trustee is informed and believes, and on that basis alleges, that because of cash flow problems, in or about November 2013, the Debtor stopped making payments to Energy Solutions for work on the Oronogo mine project. By April 1, 2014, Energy Solutions asserted that it was owed approximately $3.1 million in connection with the Oronogo mine project, of which approximately one-half was owed by the Debtor.

48.     The Trustee is informed and believes, and on that basis alleges, that, despite the Debtor's financial problems and obvious need for cash, in or about 2013, the Debtor either "wrote off" or "forgave" Sullivan's $60,000.00 debt to the Debtor arising out of the December 31, 2010 loan. The Trustee is further informed and believes, and on that basis alleges, that Debtor never received any interest or principal

11

payments from Sullivan in connection with this loan.  The Trustee is further informed and believes, and on that basis alleges, that the Debtor's board of directors either approved the writing off or forgiveness of Sullivan's $60,000.00 debt to the Debtor or were negligent in failing to supervise and/or monitor Sullivan's self-dealing with the Debtor.

49.    The Trustee is informed and believes, and on that basis alleges, that, despite the Debtor's serious financial problems, Sullivan routinely used his corporate credit card to purchase personal luxury items, including designer suits, and caused the Debtor to pay the charges for these items.  The Trustee is further informed and believes, and on that basis alleges, that Sullivan's personal charges were often flagged by the Debtor's accountants and/or auditors as improper business expenses and that, as a result, the Debtor was forced on several occasions to revise its books and records to reflect the Debtor's payments for these items as deemed "distributions" to Sullivan and to make additional distributions to the Debtor's other shareholders to balance the company's books.  The Trustee is further informed and believes, and on that basis alleges, that the Defendants other than Sullivan knew about this practice and either ratified or allowed it or were negligent in failing to properly monitor Sullivan's activities.

50.    The Trustee is informed and believes, and on that basis alleges, that between April 1, 2013 and March 31, 2014, the Debtor's board of directors authorized, ratified, or otherwise allowed distributions by the Debtor to the company's shareholders totaling an additional approximately $183,237.89.  As with the previous distributions, these distributions were paid solely to or for the benefit of the Debtor's directors and officers—Sullivan, Quattrone, and Giglio.

51.    The Trustee is informed and believes, and on that basis alleges, that in 2014 the Debtor paid Sullivan a salary of $203,184.80 and paid Quattrone a salary of $117,766.40.  These salary amounts were in addition to the substantial illegal distributions paid by the Debtor to Sullivan and Quattrone.

52.     According to the Debtor's Statement of Financial Affairs filed under penalty of perjury in the Debtor's bankruptcy case, the Debtor suffered losses of $839,559.00 in 2014.

53.     The Trustee is informed and believes, and on that basis alleges, that the Debtor's cash crisis worsened in early- to mid-2014.  The Trustee is further informed and believes, and on that basis alleges, that, in April 2014, the Debtor defaulted on payment to SE PBR project subcontractor, Weston Solutions, Inc. ("Weston") (approximately $770,000.00).

54.     The Trustee is informed and believes, and on that basis alleges, that, at some point in mid-2014, the Debtor entered into an off-books arrangement with Energy Solutions to divert payments to Energy Solutions outside of Bridge Bank borrowing restrictions to placate Energy Solutions and forestall disclosure by Energy Solutions to federal contracting authorities that the Debtor had defaulted on required vendor payments.  The Trustee is further informed and believes, and on that basis alleges, that the Debtor's Agreement with Energy Solutions provided that Energy Solutions would perform substantially greater work than originally contracted and receive 100% of contract payments from the Environmental Protection Agency until the agreed amount was repaid on past due invoices.  The Trustee is further informed and believes, and on that basis alleges, that, beginning in May 2014, Energy Solutions was paid through an off-books bank account.

55.     The Trustee is informed and believes, and on that basis alleges, that the Debtor provided Bridge Bank with a Borrowing Base Certificate on or about November 15, 2014, which indicated that the Debtor was "over advanced" on the parties' Business Finance Agreement by approximately $1.5 million.

56.     The Trustee is informed and believes, and on that basis alleges, that as a result of the November 15, 2014 Borrowing Base Certificate, the Debtor engaged in work-out negotiations with Bridge Bank.  The Trustee is further informed and

believes, and on that basis alleges, that Bridge Bank asked the Debtor to find a replacement lender.

57.    The Trustee is informed and believes, and on that basis alleges, that in December 2014, the Debtor entered into an agreement with Coral Capital to replace Bridge Bank as the Debtor's principal lender.  The Trustee is further informed and believes, and on that basis alleges, that the Debtor's management eventually determined that the agreement with Coral Capital would not provide adequate funding to payoff Bridge Bank and leave the Debtor with any remaining borrowing capacity and, as a result, the Debtor refused to move forward on the agreement with Coral Capital.  The Trustee is further informed and believes, and on that basis alleges, that Coral Capital filed a complaint against the Debtor for, among other things, breach of the parties' agreement and foreclosure of security interests on January 28, 2015 in the Supreme Court of the State of New York, *Coral Capital Solutions, LLC v. Sullivan International Group, Inc., et al.*, Case No. 650175/2015.

58.    The Trustee is informed and believes, and on the basis alleges, that, on or about December 15, 2014, the Debtor retained the law firm of Sullivan Hill Lewin Rez & Engel APLC to help the Debtor prepare for a chapter 11 filing.

59.    In December 2014, the Debtor also retained the services of 3C Advisors & Associates, Inc. ("3C"), a financial advisory firm.  Steve Jones ("Jones") is a Managing Director at 3C.  At all times relevant to the allegations in this Complaint, David Prolman ("Prolman") was the head of the Corporate Advisory Services Practice at 3C.

60.    On or about December 29, 2014, at or about the same time that the Debtor entered into the Forbearance Agreement and Eighth Business Financing Modification Agreement with Bridge Bank, Sullivan, Quattrone, and the Bruce A. Quattrone Trust–1993, signed agreements under which they pledged the following additional collateral to secure their personal guaranties of the Debtor's obligations under the Bridge Bank Business Finance Agreement:  (a) an account owned by Bruce A. Quattrone Trust–1993 and maintained at Charles Schwab; (b) real property owned by Quattrone and

commonly described as 8610 Herrington Way, San Diego, California; (c) real property owned by Sullivan and commonly described as 8377-8367 Nottingham Road, Nisswa, Minnesota; and (d) real property owned by Sullivan and commonly described as 370 Marshall Avenue, Unit 409, St. Paul, Minnesota.

61.    Trustee is informed and believes, and on that basis alleges, that, beginning in early 2015, the Debtor began to delay payment to critical vendors on the Hawaii MAAC contract (Prometheus—$628,650.00) and the Sultrac contract (Denovo Constructors—$1,687,182.00).

62.    The Trustee is informed and believes, and on that basis alleges, that, shortly after 3C was retained, Jones presented the Debtor with a valuation model that suggested the Debtor was worth approximately $18,000,000.00.  The Trustee is further informed and believes, and on that basis alleges, that 3C advised Sullivan that the best means to maximize this value for the benefit of all parties was to pursue a sale of the Debtors' assets and/or business.  The Trustee is further informed and believes, and on that basis alleges, that during these discussions, Sullivan inquired about the potential "tax consequences" of a potential sale of the Debtor's assets and/or business.

63.    The Trustee is informed and believes, and on that basis alleges, that either 3C or Sullivan contacted CohnReznick LLP, a national professional services and accounting firm headquartered in New York.  Apparently, the tax professionals at CohnReznick LLP indicated that the firm needed transaction specifics in order to analyze and explain the tax consequences of a potential asset and/or business sale. Unsatisfied, Prolman offered to arrange an introduction between Sullivan and the tax professionals at Squar Milner.

64.    The Trustee is informed and believes, and on that basis alleges, that on or about February 9, 2015, Sullivan, Quattrone, and Prolman met with Keith Troutman ("Troutman").  Troutman is the Tax Partner-in-Charge, Tax Services, for the San Diego office of Squar Milner.  The Trustee is further informed and believes, and on that basis alleges, that during this meeting Sullivan was specifically advised that a

15

sale of the Debtor's assets/business for millions would result in millions of dollars in personal tax liability for Sullivan.  The Trustee is further informed and believes, and on that basis alleges, that Squar Milner advised Sullivan that because the Debtor is a Subchapter S corporation and Sullivan owns more than two-thirds of the shares of the Debtor and had little or no tax basis, Sullivan would possibly face millions in potential tax liability from the sale of the Debtor's assets/business even if he and the other shareholders received little or nothing from the sale after payment of the Debtor's secured creditors.

65.     The Trustee is informed and believes, and on that basis alleges, that after the meeting with Squar Milner, Prolman reiterated to Sullivan that sale of the Debtor's assets/business remained the best option for the Debtor and explained that Sullivan might be required to file for personal chapter 7 bankruptcy to address his tax liabilities. The Trustee is further informed and believes, and on that basis alleges, that Sullivan unequivocally stated to Prolman that he would not consider filing personal chapter 7 bankruptcy.

66.     Based on the tax advice received from Squar Milner and the personal guaranties of the Debtor's liability to Bridge Bank by Sullivan and Quattrone, the Defendants essentially abandoned any real efforts to sell the Debtor's business for fair value and, instead, engaged in a strategy designed solely to funnel as much money as possible to Bridge Bank without creating any tax liability for Sullivan.  The Defendants—including Sullivan and Quattrone—shifted their focus away from trying to maximize value for the benefit of the Debtor and its creditors to protecting their personal interests.

67.     On March 19, 2015, Bridge Bank issued its Notice of Default to Debtor under the Finance Agreement and Eighth Forbearance Agreement.

68.     The Trustee is informed and believes, and on that basis alleges, that between April 1, 2014 and March 31, 2015, the Debtor's board of directors authorized,

16

ratified, or otherwise allowed additional distributions by the Debtor to the company's shareholders totaling approximately $375,515.58.

69.     According to the Debtor's Statement of Financial Affairs filed under penalty of perjury in the Debtor's bankruptcy case, the Debtor suffered losses of $144,326.00 in January and February 2014.

70.     The Trustee is informed and believes, and on that basis alleges, that the Defendants were aware that the Debtor was scheduled to receive approximately $2.0 million in payments under the Hawaii MAAC and Sultrac contracts in late March or early April 2015.  The Trustee is informed and believes, and on that basis alleges, that the Defendants intentionally timed the Debtor's chapter 11 filing to occur after these funds were received, deposited them into the Debtor's "sweep" account with Bridge Bank, and the funds were in fact "swept" by Bridge Bank and applied to the Debtor's obligations under the Bridge Bank Business Finance Agreement.

71.     The Trustee is informed and believes, and on that basis alleges, that the Debtor's board of directors met by telephone on March 30, 2015 and authorized the Debtor's chapter 11 filing.  The Trustee is further informed and believes, and on that basis alleges, that the Debtor's chapter 11 filing was delayed primarily to allow Bridge Bank time to "sweep" the payments made to the Debtor under the Hawaii MAAC and Sultrac contracts and apply those funds to the Debtor's obligations under the Bridge Bank Business Finance Agreement.  The Trustee is further informed and believes, and on that basis alleges, that these actions were taken specifically to reduce Sullivan's and Quattrone's potential liability under their personal guaranties of the Debtor's obligations under the Bridge Bank Business Finance Agreement.

72.     During the week ending April 3, 2015, immediately preceding the Petition Date, the Debtor received collections totaling $2,020,663.00 from its billings on the Hawaii MAAC and Sultrac contracts, all of which were paid to Bridge Bank.

73.     The Debtor filed for chapter 11 bankruptcy protection on April 6, 2015.

74.    The Trustee is informed and believes, and on that basis alleges, that the Debtor's board of directors failed to properly supervise and oversee the Debtor's operations leading up to and after the Debtor's chapter 11 filing.  The Trustee is further informed and believes, and on that basis alleges, that the Debtor's board of directors met only one or twice in the several months leading up to the Debtor's chapter 11 filing and did not meet at all after the Petition Date, essentially abdicating its responsibility and duties to Sullivan and Quattrone.

75.    The Trustee is informed and believes, and on that basis alleges, that, shortly before the Petition Date, Sullivan caused the Debtor to pay Smith (the Debtor's Chief Operating Officer) for his accrued paid time off.  The Trustee is informed and believes, and on that basis alleges, that Smith was not entitled to this payment under California law or otherwise, and that the payment to Smith was made solely as a favor to Smith because of his status as an officer of the Debtor.

76.    The Trustee is informed and believes, and on that basis alleges, that shortly before the Petition Date, Prolman was tasked with drafting the bankruptcy engagement letter between 3C and the Debtor.  Prolman provided a draft of the engagement letter to Jones, which included a "Consultation Performance Fee" of four percent (4%) for non-refinancing transactions.  Jones instructed Prolman to increase the fee to five percent (5%) and explained that Sullivan had agreed to the increased fee (which would potentially cost the Debtor as much as $100,000.00) based on a side deal with Jones under which 3C would hire Sullivan at the conclusion of the bankruptcy case.  Prolman objected to this arrangement and the fee was eventually reduced to four percent (4%), but this conduct clearly demonstrates Sullivan's willingness to place his personal interests above the Debtor's interests.

77.    According to the Debtor's books and records, in the four (4) years immediately preceding the Petition Date, the Debtor's board of directors authorized and the Debtor actually made approximately $2,312,331.45 in distributions to the

18

Debtor's shareholders.  These distributions were made despite the fact that the Debtor was losing money and in desperate need.

78.    The distributions alleged herein constituted transfers of an interest of the Debtor in property.  The Trustee is informed and believes, and on that basis alleges, that the Debtor made these distributions to the Debtor's shareholders with the actual intent to hinder, delay, or defraud one or more of its creditors.  In the alternative, the Trustee is further informed and believes, and on that basis alleges, that the Debtor was (a) insolvent at the time of the distributions, or became insolvent as a result of the distributions, or (b) intended to incur or believed that it would incur debts that would be beyond its ability to pay as such debts matured at the time of the distributions.  As such, the Trustee alleges that these distributions constituted improper and fraudulent transfers under section 548 of the Bankruptcy Code and/or California's version of the Uniform Fraudulent Transfer Action (sections 3439 through 3439.12 of the California Civil Code).

79.    The distributions alleged herein also violated both sections 500 and 501 of the California Corporations Code.  The Trustee is informed and believes, and on that basis alleges, that in approving these distributions the Debtor's board of directors did not determine, and could not have determined in good faith, that:  (1) the amount of retained earnings of the Debtor immediately prior to the distribution equaled or exceeded the proposed distribution plus the "preferential dividends arrears amount;" or (2) immediately after the distribution, the value of the Debtor's assets would equal or exceed the sum of its total liabilities plus the "preferential rights amount."  In the alternative, the Trustee is further informed and believes, and on that basis alleges, that these distributions were illegal because at the time of the distribution the Debtor was, or as a result became, likely to be unable to meet its liabilities (except those whose payment was otherwise adequately provided for) as they matured.

80.    The Trustee alleges that the distributions specified above were illegal under California law and constituted a substantial cash drain on the Debtor that

19

materially damaged the Debtor's business and ability to meet its debts and other obligations. The Trustee further alleges that the Debtor received no value in return for making these substantial distributions and the distributions were made solely to benefit and enrich the Debtor's insiders, including the Debtor's executives and board members (who were also the Debtor's sole shareholders).

81.    The Trustee alleges that the Defendants breached their duty to the Debtor and creditors by authorizing or allowing these improper, illegal, and fraudulent distributions to the Debtor's shareholders in violation of California and federal bankruptcy law.

82.    Shortly after the Petition Date, the Debtor filed documents with the Bankruptcy Court claiming that it and 3C had been working on the potential sale of the Debtor's core operating assets as an ongoing concern. The Debtor vowed to continue to work with 3C to find a suitable purchaser for its core business operating assets. These statements were untrue. In reality, Sullivan had long since determined that a sale of the Debtor's business for fair value was not going to happen because of the likely tax consequences to him arising out of a sale.

83.    At the same time, the Debtor submitted documents with the Bankruptcy Court estimating under penalty of perjury that its core business assets (not including general intangibles, goodwill, and assembled workforce) were worth approximately $10,398,167.

84.    The Trustee is informed and believes, and on that basis alleges, that, on or about June 19, 2015, Bridge Bank contacted the Debtor because the Debtor had written checks on its operating account that exceeded the account balance. The Trustee is further informed and believes, and on that basis alleges, that Bridge Bank requested instructions as to which checks should be honored and which should be returned for insufficient funds. Trustee is further informed and believes, and on that basis alleges, that Sullivan instructed Bridge Bank to pay the check covering the Debtor's

1  headquarters rent in the amount of $39,953.52 because the lease was personally

2  guaranteed by Sullivan.

3        85.    Prolman eventually resigned from 3C in protest because he became

4  convinced that Sullivan was focused solely on attempting to manipulate the chapter 11

5  case for his personal economic gain.  Before resigning, on June 23, 2015, Prolman sent

6  a letter to James P. Hill (the Debtor's chapter 11 counsel) outlining what Prolman

7  contended were serious ethical breaches by Jones and Sullivan.

8        86.    Both before and after the Petition Date, the Defendants either

9  intentionally or negligently mismanaged the Debtor's business.  Rather than attempting

10  to maximize the value of the Debtor's business and/or assets, the Defendants focused

11  instead on funneling as much money as possible to Bridge Bank to pay down the

12  Debtor's obligations to Bridge Bank (because of the personal guarantees by Sullivan

13  and Quattrone).  In the process, the Defendants materially damaged the value of the

14  Debtor's business and/or assets.

15        87.    For example, the Trustee is informed and believes, and on that basis

16  alleges, that the Defendants caused or allowed the Debtor to use funds that were

17  earmarked to pay subcontractors and other creditors to instead pay down the Bridge

18  Bank debt.  The Trustee is further informed and believes, and on that basis alleges, that

19  the Defendants caused or allowed the Debtor to falsely represent to its customers

20  (primarily the United States) that certain subcontractor and other debts were paid

21  when, in fact, the money had been used to pay Bridge Bank.  In doing so, the

22  Defendants showed complete disregard for their duties to the Debtor and creditors

23  generally.

24        88.    The Trustee is informed and believes, and on that basis alleges, that

25  SCJV's right to payment under the SE PBR project was potentially one of the largest

26  and most valuable assets of the Debtor's bankruptcy estate.  By the Fall of 2014, SCJV

27  was owed millions on account of work performed on the SE PBR contract that it was

28  unable to collect.  In turn, SCJV had stopped making payments to its subcontractor,

Weston.  In addition to the earlier missed payment to Weston in April 2014 for $770,000.00, Weston was owed approximately $1 million at the end of 2014 on account of additional unpaid SE PBR related invoices.  In early 2015, Weston suspended work on the project altogether, and asserted that it was owed approximately an additional $300,000.

89.    On or about August 7, 2015, the Debtor submitted a claim for $1,267,810.00 to the Air Force under the SE PBR project.  The claim falsely represented that it was being asserted by both the Debtor and Weston as part of the "SCJV Team."  The Air Force and Weston now apparently contend that the SE PBR claim submitted by the Debtor was not authorized by Weston and contains false and inaccurate information.  In addition, the Air Force contends that SCJV breached the terms of the SE PBR agreement.

90.    Based on these allegations, the Air Force has since informed the Trustee that it will seek to cancel the SE PBR contract due to, among other things, alleged breaches of the contract by SCJV and the allegedly improper/unauthorized claim.  The Trustee is informed and believes, and on that basis alleges, that the Defendants are responsible for the actions cited by the Air Force as grounds to terminate the SCJV contract and resulting loss of millions of dollars in revenue to the Debtor.

91.    In sum, on information and belief, the Trustee alleges that the Defendants engaged in a years' long practice of using the Debtor's assets to enrich themselves through illegal dividends, fraudulent transfers, gross mismanagement of the Debtor, and use of the Debtor's assets to benefit themselves at the expense of the Debtor and its creditors.  The Trustee is further informed and believes, and on that basis alleges, that the above-referenced actions of the Defendants, as well as other acts of mismanagement and self dealing, had the ultimate effect of causing the Debtor's business operations to fail and rendering it unable to pay its debt owed to creditors.

## **FIRST CLAIM FOR RELIEF**

### **(Breach of Fiduciary Duty – All Defendants)**

92.     The Trustee incorporates by reference the allegations of paragraphs 1 through 91, inclusive, as if fully set forth herein.

93.     The Defendants were and are required to use their abilities to control and manage the Debtor in a fair, just, and equitable manner in order to ensure that the company complied with applicable laws and contractual obligations, to refrain from abusing their positions of control, and not to favor their own interests at the expense of the Debtor.

94.     The Defendants violated their fiduciary duties to the Debtor, including without limitation their duties of care, good faith, honesty and loyalty by, among other things, (a) approving the buyout of Clements' shares in 2011 for $1,229,193.75, (b) authorizing $2,312,331.45 in fraudulent transfers and/or illegal distributions to the Debtor's shareholders, (c) mismanaging the Debtor's business, (d) authorizing the payment of excessive compensation to Sullivan and Quattrone; (e) failing to adequately oversee the Debtor's business and essentially abdicating their duties and obligations to Sullivan and Quattrone; and (f) placing their own personal interests above those of the Debtor.

95.     The wrongful conduct described in this Complaint was not due to an honest error in judgment, but rather to the Defendants' gross mismanagement, bad faith, and/or reckless disregard of the rights and interests of the Debtor and its creditors and for acting without the reasonable and ordinary care which they owed the Debtor.

96.     As a result of the foregoing, the Defendants have participated in harming the Debtor and have breached fiduciary duties owed to the Debtor.  Further, the Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the other Defendants in the breaches of their fiduciary duties.

23

97.    By reason of the foregoing, the Debtor has sustained and will continue to sustain substantial damages and injuries in an amount subject to proof at trial but not less than $10,000,000.00.

### SECOND CLAIM FOR RELIEF

### (Abuse of Control – All Defendants)

98.    The Trustee incorporates by reference the allegations of paragraphs 1 through 97, inclusive, as if fully set forth herein.

99.    By virtue of their positions and financial holdings in the Debtor, the Defendants exercised control over the Debtor and its operations, and owed duties as controlling persons to not to use their positions of control within the Debtor for their own personal interests and contrary to the interest of the Debtor.

100.    The Defendants' conduct amounts to an abuse of their control of the Debtor, in violation of their obligations to the Debtor.  The Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the other Defendants in their abuse of control.

101.    As a result of the Defendants' abuse of control, the Debtor has sustained and will continue to sustain substantial damages and injuries in an amount subject to proof at trial but not less than $10,000,000.00.

### THIRD CLAIM FOR RELIEF

### (Corporate Waste – All Defendants)

102.    The Trustee incorporates by reference the allegations of paragraphs 1 through 101, inclusive, as if fully set forth herein.

103.    As alleged in detail above, the Defendants had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Debtor and in the use and preservation of its property and assets, and the highest obligation of fair dealings.

104.    The Defendants wasted the Debtor's corporate assets.  For example, the Defendants diverted corporate assets by paying illegal dividends and/or making fraudulent transfers to the Debtor's shareholders during periods when the company was

insolvent, by abandoning efforts to liquidate company assets solely because such a liquidation would have resulted in personal tax liability to the company's shareholders, and by diverting funds to Bridge Bank instead of using them to continue business operations or pay other creditors, instead of using those corporate assets for their intended purpose.

105.   As a result of the Defendants' actions, the Debtor has sustained and will continue to sustain substantial damages and injuries in an amount subject to proof at trial but not less than $10,000,000.00.

### FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment – All Defendants)

106.   The Trustee incorporates by reference the allegations of paragraphs 1 through 105, inclusive, as if fully set forth herein.

107.   The Defendants derived compensation, fees, and other benefits from the Debtor and were otherwise unjustly enriched during the time in which the wrongful practices occurred, to the detriment of the Debtor.  The Defendants profited by engaging in the wrongful conduct set forth in the Complaint above.  The Defendants also wrongfully converted funds belonging to the Debtor.

108.   The Defendants' enrichment is directly and causally related to the detriment of the Debtor.

109.   These benefits were accepted by the Defendants under such circumstances that it would be inequitable for them to be retained without payment.  As alleged above, the Defendants breached their fiduciary duties and/or abused their positions of control to the Debtor and, therefore, the Defendants are not justified to retain the benefits conferred upon them.

## FIFTH CLAIM FOR RELIEF

### (Authorization of Illegal Distributions Pursuant To California Corporations Code Section 316 – Director Defendants and Does 1 through 50)

110.   The Trustee incorporates by reference the allegations of paragraphs 1 through 109, inclusive, as if fully set forth herein.

111.   The Trustee is informed and believes, and on that basis alleges, that the Director Defendants authorized and the Debtor actually made not less than $1,365,652.44 in distributions to the Debtor's shareholders in the three (3) years prior to the Petition Date.  The Trustee is further informed and believes, and on that basis alleges, that these distributions were illegal in that they violated both sections 500 and 501 of the California Corporations Code.

112.   The Trustee is informed and believes, and on that basis alleges, that one or more creditor of the Debtor's bankruptcy estate held claims against the Debtor that arose before the date of the distributions alleged herein, and that those creditors did not consent to such distributions.

113.   The Trustee is informed and believes, and on that basis alleges, that the Director Defendants voted in favor of or otherwise authorized all illegal distributions made by the Debtor and are therefore personally liable for the amount of such distributions under section 316 of the California Corporations Code.

114.   Due to the illegal distributions alleged herein, the Debtor has been damaged in an amount to be established at trial but not less than $1,365,652.44.

## REQUEST FOR JUDGMENT

The Trustee prays for judgment as follows:

A.   Awarding compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial but not less than $10,000,000.00;

B.   Awarding punitive damages at the maximum amount permitted by law;

C.   Awarding pre-judgment interest, as well as reasonable attorneys' fees and other costs, to the full extent allowed by law;

26

1        D.      Awarding such other relief as this Court may deem just and proper.

2   DATED:  December 4, 2015              FINLAYSON TOFFER
                                          ROOSEVELT & LILLY LLP
3

4                                         By:_____ /s/ Jesse F. Finlayson_____
                                                     Jesse S. Finlayson
5
                                          Attorneys for Christopher R. Barclay,
6                                         Chapter 7 Trustee

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Christopher R. Barclay, chapter 7 trustee | DEFENDANTS<br>Steve Sullivan, Bruce Quattrone, Mark Smith, Kurt Brown, Ross Epstein, Steve Winchester, Jim Janis, Jeffrey Giglio, John Cowdery, Edward Sternagle, and DOES 1 through 50, inclusive |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Finlayson Toffer Roosevelt & Lilly LLP<br>15615 Alton Parkway, Suite 250<br>Irvine, CA 92618<br>Phone: 949.759.3810 / Fax: 949.759.3812 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☐ Debtor　☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor　☐ Other<br>☑ Trustee | ☐ Debtor　☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor　☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

breach of fiduciary duty; abuse of control; corporate waste; unjust enrichment; and director liability for authorizing illegal distributions under Cal. Corp. Code § 316

### NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11 - Recovery of money/property - § 542 turnover of property
☐ 12 - Recovery of money/property - § 547 preference
☐ 13 - Recovery of money/property - § 548 fraudulent transfer
☑ 14 - Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21 - Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31 - Approval of sale of property of estate and of co-owner - § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41 - Objection / revocation of discharge - § 727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51 - Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66 - Dischargeability - § 523(a)(1),(14),(14A) priority tax claims
☐ 62 - Dischargeability - § 523(a)(2), false pretenses, false representation, actual fraud
☐ 67 - Dischargeability - § 523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61 - Dischargeability - § 523(a)(5), domestic support
☐ 68 - Dischargeability - § 523(a)(6), willful and malicious injury
☐ 63 - Dischargeability - § 523(a)(8), student loan
☐ 64 - Dischargeability - § 523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65 - Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71 - Injunctive relief - reinstatement of stay
☐ 72 - Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81 - Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91 - Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01 - Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§ 78aaa et.seq.
☐ 02 - Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☑ Check if a jury trial is demanded in complaint | Demand $ 10,000,000.00 |

Other Relief Sought

B1040

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Sullivan International Group, Inc. | | BANKRUPTCY CASE NO.<br>15-02281-LT7 |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern | DIVISIONAL OFFICE<br>San Diego | NAME OF JUDGE<br>Hon. Laura S. Taylor |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Jesse S. Finlayson | | |
| DATE<br>12/4/15 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Jesse F. Finlayson | |

# INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature**. This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

B1040